UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Criminal No. 05-0208(GK) |
| | : | |
| v. | : | Sentencing: October 6, 2005 |
| | : | |
| **DASHIELL PONCE DE LEON,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Memorandum in Aid of Sentencing. This memorandum, together with such evidence as may be presented and the Government's allocution at the time of sentencing, is intended to apprize the court of matters relating to the appropriate sentence in this case (See, Fed. R. Crim. P. 32(c)(1)). This memorandum also addresses the impact of the Supreme Court's recent decision in United States v. Booker, 125 S. Ct. 738 (2005).

### I. INTRODUCTION

On June 22, 2005, Defendant Ponce de Leon pleaded guilty, pursuant to a written plea agreement, to a one-count Information charging a violation of 17 U.S.C. § 506(a)(1) and 18 U.S.C. § 2319(b)(1), Criminal Copyright Infringement. Defendant also agreed to the abandonment of all computer equipment and peripherals and unlawful copies of software, music, and motion pictures seized from his mother's residence, from his residence, and from his office on May 14, 2003, as fully delineated in the Abandonment of Property to the United States of America.

In exchange for the guilty plea, the Government agreed not to oppose Defendant Ponce de Leon's release pending sentencing, agreed not to oppose a 2-level downward adjustment for acceptance of responsibility and a 1-level downward adjustment for timely notifying authorities of his intention to plead guilty, and agreed not oppose to a sentence at the bottom of the applicable sentencing range. The case is scheduled for sentencing on October 6, 2005.

The facts and circumstances that form the basis of the plea involve Defendant owning and operating web sites from which he sold copies of counterfeit software priced well below the manufacturers' suggested retail prices. The infringed value of the software sold by Defendant, which includes FBI undercover purchases and other sales of identical titles identified from PayPal records, totals $1,154,395.85.

## II. FACTS

On October 21, 2002, The Software and Information Industry Association (SIIA), a trade association for the computer software industry, provided information to the Federal Bureau of Investigation (FBI), concerning a mass e-mail solicitation (spam). The e-mail advertised the sale of commercial computer software at prices far below the retail value. The e-mail was sent with the subject line, "Cheap Warez CDs." The e-mail advertised the sale of products from a company identified as, "Power Backups." The e-mail requested the recipient open an attachment file, entitled "warezcds1.html" to begin the order process. When the file was opened, the Internet web browser connected to a web site identified as "Powerbackups Ultimate Software Backup resource."

From approximately January 2002 through December 2002, Defendant Ponce de Leon, doing business as Flashlevel.com, created and operated the website, "Powerbackups Ultimate Software Backup Resource " ("www.Powerbackups.com") which advertised for sale more than 200 software program titles, all of which were protected by copyright. Neither Defendant Ponce de Leon nor any one doing business as Powerbackups Ultimate Software Backup Resource or www.Powerbackups.com were authorized by the copyright owners to reproduce, sell or distribute the software titles advertised on the website.

Additionally, from approximately December 1, 2002, through May 2003 Defendant Ponce de Leon under the auspices of his business Flashlevel.com, created and operated a website identified as "Softworks #1 Software Backup Service" ("www.Softworks.com") which advertised for sale over 200 software program titles all of which were protected by copyright. Neither Defendant Ponce de Leon nor any one doing business as Softworks #1 Software Backup Service or www.Softworks.com were authorized by the copyright owners to reproduce, sell or distribute the software titles advertised on the website.

Legitimate copies of the software programs listed for sale on the two websites have retail values ranging from $30.00 to over $26,000.00 per copy. For example, the web sites listed for sale Adobe Photoshop (retail price $699.00), Microsoft Windows XP Pro (retail price $299.00), Mastercam 8 (retail price $12,900.00) and Microsoft Windows 2K Datacenter (retail price $26,000.00). Defendant Ponce de Leon obtained copies of the pirated software programs offered for sale on the Powerbackups and Softworks web sites by downloading the pirated software programs from various warez web sites. The Powerbackups web sites advertised the pirated software programs with the following language:

> We sell Backup Cds, also known as Warez Cds. Backup Cds are copies of Software. For example if you go into a shop and buy Windows XP Pro, for about $299 you get the Serial, the CD, the Box and the Manual. When you order from Power Backups you get The Windows XP CD and the Serial Number. It works exactly the same, but you don't get the manual and the fancy box. That is a savings of $280 , and the only difference is you don't have a colorful box and manual - which are not very useful.

Similar advertising language was used on the Softworks web site.

On the Powerbackups web site, Defendant Ponce de Leon offered the pirated software programs for sale at the following prices: $24.99 for the first software program, $16.99 for the second software program with the third software program free of charge. On the Softworks web site, Defendant Ponce de Leon offered the pirated software programs for sale priced as follows: $19.99 for one software program, two software programs for $36.98, three software programs for $51.97, and four software programs for $64.96 with the fifth software program free of charge. Both web sites instructed purchasers that payment for the software programs should be made through PayPal, and provided a link to PayPal.

Defendant Ponce de Leon paid two other individuals, referred to herein as "M.R." "R.F." to open PayPal accounts in their names, which were linked to checking accounts held in those individuals' names. M.R. and R.F. gave Defendant Ponce D Leon both the access codes to the PayPal accounts and pre-signed blank checks from the checking accounts. Defendant Ponce de Leon transferred payments received into the M.R. and R.F. PayPal accounts into M.R.'s and R.F.'s checking accounts. Defendant Ponce de Leon made cash withdrawals from M.R.'s and R.F.'s checking accounts and used pre-signed checks to make transfers into a checking account in a Houston, Texas bank, over which Defendant Ponce de Leon had control.

Once an order was received on the Powerbackups or Softworks web sites, Defendant Ponce de Leon would reproduce pirated software programs, package the CDs for distribution, and mail the CDs to customers.

From approximately January 2002, through May 2003, Defendant Ponce de Leon received via PayPal and converted to his own benefit approximately $192,000.00 in payments from persons purchasing the pirated software described above.

Agents of the Federal Bureau of Investigation (FBI), acting in an undercover capacity, made four purchases of multiple software titles from Defendant Ponce de Leon's websites, as follows: On December 1, 2002, an order was placed on the Powerbackups website for three titles, Macromedia Flash MX (retail value $499.00), Microsoft Office XP Premium (retail value $579.00), and Microsoft Windows XP Pro (retail value $299.00). This order directed, and items were subsequently shipped to, an address in the District of Columbia. On December 27, 2002, an order was placed for five titles, Adobe Photoshop 7 (retail value $609.00), Autodesk Building Systems (retail value $4,016.65), Lightwave 6 (retail value $2,495.00), MS Office XP Premium (retail value $579.00), and NBA Live 2003 (retail value $39.99). The order directed and items were subsequently shipped to an address in the state of Virginia. The December 31, 2002 order was for Adobe Golive 6 (retail value $399.00), Lightwave 6 (retail value $2,495.00), Mastercam 8 (retail value $12,900.00), Macromedia Studio MX (retail value $899.00), and Macromedia Flash 5 (retail value $499.00). This order also directed, and items were subsequently shipped to, an address in the state of Virginia. The April 22, 2003, order was for Autodesk Autocad 2004 (retail value $3,750.00), Harry Potter 2 (retail value $34.99), Lightwave 7 (retail value $795.00), MS Windows 2K Datacenter (retail value $26,000.00), and MS Office XP 2003 (retail value $579.00). This order directed, and items were

subsequently shipped to, an address in the District of Columbia.  Upon receipt of each order, Defendant Ponce de Leon copied the pirated software programs onto CDs.  For each order, the CDs were packaged inside mailing envelopes with a false Miami, Florida, return address.  The total retail value of all products ordered by the FBI was $57,467.63.  The copyright owner for each software title is reflected in the table below:

| Copyright Owner | Software | Retail Price | Copies |
| --- | --- | --- | --- |
| Adobe | Photoshop 7 | $ 609.00 | 1 |
| Adobe | Golive 6 | $ 399.00 | 1 |
| Autodesk | Building Systems | $ 4,016.65 | 1 |
| Autodesk | Autocad 2004 | $ 3,750.00 | 1 |
| Electronic Arts | Harry Potter 2 | $ 34.99 | 1 |
| Electronic Arts | NBA Live 2003 | $ 39.99 | 1 |
| NewTek | Lightwave 6 | $ 2,495.00 | 2 |
| NewTek | Lightwave 7 | $ 795.00 | 1 |
| Macromedia | Flash MX | $ 499.00 | 1 |
| Macromedia | Flash 5 | $ 499.00 | 1 |
| Macromedia | Studio MX | $ 899.00 | 1 |
| CNC Software Inc. | Mastercam 8 | $12,900.00 | 1 |
| Microsoft | Office XP Premium | $ 579.00 | 2 |
| Microsoft | Office XP 2003 | $ 579.00 | 1 |
| Microsoft | Windows XP Pro | $ 299.00 | 1 |
| Microsoft | Windows 2K Datacenter | $26,000.00 | 1 |
| | Total Retail Value: | $57,467.63 | |

All of the software and video game titles purchased by the FBI were sent to either the industry trade organization that represents the copyright owner, the copyright owner or both.  The copyright owners and the industry trade organizations concluded that all of the software and video game titles referenced above were pirated copies produced without the permission of the copyright owners.

The total retail value of all pirated sales for the titles reflected above, including the FBI undercover purchases and identical titles identified from the Paypal records totals $1,154,395.85. FBI Agents compared the pirated software and video game titles they purchased to the PayPal records reflecting other sales. From those records they identified sales of identical titles. By this scheme, the Defendant wrongfully obtained approximately $192,000.00 in sales proceeds.

### III. ADDITIONAL EVIDENCE OF WILLFULNESS

On February 2, 2001, six entertainment software publishing companies – all members of the Entertainment Software Association - filed a federal Complaint against Defendant Ponce de Leon for copyright infringement, contributory copyright infringement, trademark infringement, and false designation of origin/unfair competition.[1] The specific companies were Activision, Inc.; Eidos Interactive, Inc.; Electronic Arts Inc.; Interplay Entertainment Corp., Sierra On-Line, Inc., and The 3DO Company. Based upon their investigation of Defendant Ponce de Leon's activities prior to the filing of their lawsuit, ESA and the Plaintiffs believed that he was unlawfully reproducing Plaintiffs' entertainment software and offering the pirated copies for sale and for free downloading through the following web sites: www.macrowarez.com, www.warezgateway.com, and www.backupcds.com.

In April 2001, defendant Ponce de Leon agreed to settle the lawsuit with the Plaintiffs, as reflected in a settlement agreement dated April 9, 2001. As part of the agreement, Defendant Ponce de Leon agreed among other things, to: 1) cease and desist infringing Plaintiffs' intellectual property rights now and in the future; 2) deliver sales information, all infringing

---

[1] Activision, Inc., et. al., v. Dashiell Ponce de Leon, Case No. C 01 0655 5BA, U.S. District Court, N.D. Cal.

material, including pirated copies of entertainment software in his possession, and all equipment used to produce the infringing material; 3) transfer the domain names of the three web sites used to distribute pirated copies of entertainment software; and 4) pay, in monthly installments, restitution to Plaintiffs in the amount of $20,250.00.[2]

Pursuant to the settlement agreement, Defendant Ponce de Leon also provided a written apology for Plaintiffs' use in their Anti-Piracy publicity campaign, in which he acknowledged his wrongful conduct and stated:

> I used to run Internet sites where you could get pirate versions of video games, including macrowarez.org and backupcds.com. But I had to stop because the video game publishers sued me and took away my sites and my computer equipment. I also have to pay them thousands of dollars in damages.
>
> Please believe me when I tell you that trying to sell backup versions of video games is a bad move. This is illegal activity because, despite what you read, making backup copies for other people is against the law. The video game industry is getting really serious about making sure that people on the Internet don't do this any more. They spend lots of money on developing and marketing video games so they can't compete with people who make and sell cheap copies of their games. So they are making extra efforts to go after people on the Internet who do this. They even will go after you if you don't sell the games but just post them for download.
>
> I hope people who read this will learn from my example that the backup copy business is illegal, wrong and risky. I am now paying the price for that. But I've learned my lesson: I'll never do this again.

Moreover, per the settlement agreement in the case, the parties agreed to a Stipulation to Entry of Judgment and Permanent Injunction; Order, which was signed by the Court on May 30, 2001. A copy of the Stipulation is at Attachment No. 1.

---

[2] According to Anti-Piracy Counsel for ESA, Defendant Ponce de Leon has been making the installment payments, albeit not always timely, and the amount is nearly or already paid in full.

## IV.  IMPACT OF THESE CRIMES ON U.S. INDUSTRIES

Major U.S. industries realize substantial losses each year from the piracy of intellectual property in the form of displaced sales.  The two leading trade associations of the software industry are the Business Software Alliance (BSA) and the Software and Information Industry Association (SIIA).  According to BSA and SIIA, software piracy has cost the United States 3.2 billion dollars annually in retail sales of business software applications.  This figure does not take into account the piracy of game software and software not classified as business software.  The total impact of software piracy worldwide is estimated at 12 billion dollars, annually.

Members of the Entertainment Software Association (ESA) include businesses and game developers that publish video and computer games for video game consoles, personal computers, and the Internet.  ESA members account for more than 90% of the 6.9 billion dollars in entertainment software sold in the U.S. annually.  Piracy is estimated to cost the entertainment software industry in excess of 3 billion dollars annually.

Those individuals and businesses affected by these crimes include, among many others, those whose creative talents produced the ideas for the copyrighted works, individuals in the manufacturing process, the marketing chain, the distribution lines, the advertising industry, and employees and shareholders of the various companies that own the copyrights.  In short, these crimes negatively impact the entire U.S. economy.

## V. SENTENCING CALCULATION

### A. Statutory Maxima

The maximum statutory penalty provided for violation of Title 17, United States Code, Section 506(a)(1) and Title 18, United States Code, Section 2319(b)(1), Criminal Copyright Infringement, is five years confinement, a fine of $250,000.00, or both.

### B. Sentencing Guideline Calculation

The government respectfully requests that the Court follow the Guidelines calculations set forth in the Presentence Investigation Report ("PSR") which correctly calculates the Defendant's total offense level at 26. See PSR ¶ 3. This includes the base offense level of 8 pursuant to U.S.S.G. §2B5.3(a), a 16-level enhancement for an infringement amount of more than $1,154,395.85, pursuant to § 2B1.1(b)(1)(I), and a 2-level enhancement because the offense involves the manufacture of infringing items, pursuant to § 2B5.3(b)(2). There is a 2-point reduction, because the Defendant accepts responsibility for the offense, pursuant to § 3E1.1(a) and an additional 1-point reduction for timely notifying authorities of his intent to plead guilty, pursuant to § 3E1.1(b). The result is a total offense level of 23. The PSR also has calculated correctly the Defendant's criminal history as Category I. See PSR ¶ 57. Therefore, the guideline range for Defendant Ponce de Leon is correctly calculated in the PSR as 46-57 months. The U.S. Probation Officer did not find factors indicating that a downward departure is warranted.

### C. The Impact of Booker

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). The Court determined that a mandatory system

in which a sentence is increased based on factual findings by a judge violates the right to trial by jury. As a remedy, the Court severed and excised the statutory provision making the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus declaring the Guidelines "effectively advisory." Booker, 125 S. Ct. at 756. Although the Court struck down the provision that made the Guidelines mandatory, it expressly refused to invalidate the Guidelines in their entirety.

In the wake of Booker, this Court must make a correct calculation under the existing Sentencing Guidelines, and then consider the final guideline calculation when determining the sentence to be imposed. Justice Breyer's majority opinion directed that "[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." Id. at 767. The position of the United States is that, absent highly unusual circumstances, the sentence in a criminal case should fall within the guideline range as determined by the Court. This view is shared by Congress and the U.S. Supreme Court. As every Supreme Court justice in the various opinions in Booker recognized, the Guidelines carry out the express national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible and be based on the offender's actual conduct and history.

Moreover, the Guidelines, consisting of offense characteristics and various grounds for departure, address all of the considerations relevant to sentencing, as articulated in 18 U.S.C. § 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the Defendant;" "the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the Defendant; and (D) to provide the Defendant with needed educational or vocational training,

medical care, or other correctional treatment in the most effective manner;" and "the need to avoid unwarranted sentence disparities among Defendants with similar records who have been found guilty of similar conduct . . . ."

Accordingly, a sentence within the guideline range is presumptively reasonable, and accommodates the Congressional purpose, affirmed by the Supreme Court, of obtaining fair sentences which are uniform to the extent possible. The government anticipates that only sentences outside the guideline range will be subject to appellate scrutiny for reasonableness in light of the Congressional mandate. In this case, as explained further below, no unusual circumstances exist which warrant an exception to the preference for guideline sentencing. Therefore, the government respectfully requests that the Court sentence Defendant Ponce de Leon within the Guidelines range calculated in the PSR.

**D. Restitution**

The Government requests that the Court order restitution in the amount of $1,154,395.85 as delineated in the PSR at ¶ 71.

## V. CONCLUSION

In 2001, six entertainment software publishing companies filed a lawsuit against Defendant Ponce de Leon for, among other things, copyright infringement. The facts of that civil action are virtually identical to the facts that form of the basis of the instant criminal case. Defendant Ponce de Leon was made fully aware of the wrongfulness of his activities when he was sued by private industry. He promised to stop engaging in such behavior in connection with the settlement of that lawsuit. However, rather than keep his promise, within 16 months of signing a stipulation of judgment and permanent injunction, he chose to persist in this criminal

activity to the detriment of the copyright owners.

Based upon the foregoing, the Government respectfully requests that this Court impose a sentence in accord with the applicable Guideline range and with the terms of the plea agreement.

Respectfully submitted,

KENNETH L. WAINSTEIN
UNITED STATES ATTORNEY

By: _____
SHERRI L. SCHORNSTEIN
Assistant United States Attorney
Computer Hacking & Intellectual Property Unit
 D.C. Bar No. 415219
(202) 514-6956

_____
CHRISTOPHER MERRIAM
Trial Attorney
U.S. Department of Justice
Computer Crime and Intellectual
 Property Section

## **CERTIFICATE OF SERVICE**

      I hereby certify that a copy of the foregoing Government's Memorandum in Aid of Sentencing was served upon counsel for Defendant, Thomas Abbenante, Esq., 1919 Pennsylvania, Ave., N.W. Suite 200, Washington, D.C. 20006, this \_\_\_\_, day of September, 2005, via the U.S. Mails.

      _____
      SHERRI L. SCHORNSTEIN
      Assistant U.S. Attorney